James E. HARRIS, Appellant,

v.

UNITED STATES, Appellee.

No. 89–CF–1482.

District of Columbia Court of Appeals.

Argued Feb. 27, 1992.

Decided Aug. 21, 1992.

Veronice A. Holt, Washington, D.C., appointed by the court, for appellant.

Frederick W. Yette, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Roy W. McLeese, III, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN, SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

■ James E. Harris was convicted by a jury of possession of PCP and marijuana with intent to distribute each (PWID), in violation of D.C.Code § 33–541(a)(1) (1988). Of his numerous claims on appeal, the sole one requiring more than summary consideration is his contention that he was denied his constitutional right to present witnesses. This issue arose when the trial judge sustained the blanket invocation by James Lee Martin of his privilege against self-incrimination and declined to require Martin, who had previously testified at a pretrial hearing, to be sworn as a defense witness at trial. We conclude that the trial judge applied an incorrect standard to Martin's invocation of the privilege, but that reversal is not required, because the error was harmless beyond a reasonable doubt. Accordingly, we affirm.

I

THE TRIAL COURT PROCEEDINGS

A. The Suppression Hearing.

The principal prosecution witness against Harris, both at a hearing on Harris' pretrial motion to suppress tangible evidence and later at trial, was Sergeant Gerald Neill, a ten-year veteran of the Metropolitan Police Department and an experienced combatant in its drug wars. Sergeant Neill testified at the suppression hearing that on the afternoon of March 10, 1989, while dressed in plain clothes and driving an unmarked car, he was en route from the District of Columbia Courthouse[1] to the Third District station house when his suspicions were aroused by activity at a car parked near the intersection of Seventh and Q Streets, N.W. A man later identified as David Wright, who was eventually to become Harris' codefendant, was seated behind the steering wheel of the vehicle. Two other men, who subsequently turned out to be Harris (the appellant) and Martin (the man who later invoked his Fifth Amendment privilege) both approached the car. Martin[2] was "look[ing] up and down the street like a lookout man." Suspecting on the basis of the men's conduct that some sort of narcotics transaction was about to take place, Neill turned his car around to observe further.

According to Sergeant Neill, the drug transaction which he had anticipated soon materialized. The man behind the wheel of the car (Wright) handed an object to Harris. Initially, Neill could not tell exactly what the object was, but it appeared to resemble a small bottle. Neill pulled his car in front of the other vehicle and walked towards Harris. Seeing Neill approach, Harris walked to a doorway, threw the bottle-like object to the ground, and started to walk back. At this point, Sergeant Neill drew his service revolver. He ordered all three men first to stand against the wall and then to lie on the ground.[3]

After uniformed police officers arrived, the object which Harris had thrown to the ground was recovered. It turned out to be a McCormick spice bottle containing eighteen tin-foil packets of marijuana laced with PCP. Wright and Harris were placed under arrest, and each was eventually indicted, Wright for distribution and Harris for PWID.

Martin was a witness for the defense at the suppression hearing. He testified that at the time of the events in question, he was at the intersection of 7th and Q Streets, N.W., talking to Harris and to Wright, who was Martin's cousin. He related that a police officer (obviously Sergeant Neill) arrived and got out of his vehicle with his gun drawn. The officer told the men "So and so, get up against the

---

1. The courthouse has since been renamed in honor of the late Chief Judge H. Carl Moultrie I.

2. Martin was not arrested, and his identity as the third man was not disclosed until he testified as a defense witness at the hearing on Harris' motion to suppress evidence.

3. Sergeant Neill steadfastly denied that he had pulled his weapon before Harris threw down the bottle.

wall!" On cross-examination, the prosecutor interrogated Martin regarding his own precise location, the officer's location, and the direction in which the officer was travelling.

■ Based on Martin's testimony, Harris argued that Sergeant Neill had pulled his weapon and detained Harris before Harris had thrown down the contraband. He therefore claimed that the drugs had been recovered as a result of an unlawful seizure which had been effected without articulable suspicion of wrongdoing on Harris' part. Crediting Sergeant Neill over Martin, however,[4] the judge found that Harris had discarded the bottle and its contents before Neill pulled his revolver, that Neill was not in pursuit of Harris when the drugs were dropped, and that the contraband had thus been abandoned.[5] The judge denied Harris' motion to suppress evidence.

## B. The Controversy over Martin's Privilege Against Self-Incrimination.

During a discussion of preliminary matters following the denial of the motion to suppress, Harris' counsel disclosed that she proposed to call Martin as a defense witness at trial. The judge appointed an attorney to represent Martin and to counsel him with respect to his privilege against self-incrimination.[6] The attorney reported that "she had been advised that [Martin] did

answer a question this morning in a motions hearing, and that also that question was not preceded by advice of rights. I have not been advised that he has ever been advised of his right against self-incrimination." The judge responded that "I don't think he has been" (id.).

Apparently recognizing that Martin might have incriminated himself already, the judge tried gallantly, and not without some success, to put the genie back in the bottle. He asked the prosecutor whether "I am correct ... that in no way will anything that [Martin] said this morning be used against him? And nobody is going to argue that he has now waived his fifth amendment right because he testified this morning?" The prosecutor agreed that he would not use Martin's testimony against him or argue that Martin had waived his Fifth Amendment privilege. Id. Defense counsel, however, stated that she had advised Mr. Martin of his Fifth Amendment rights when she interviewed him in preparation for trial, and the following exchange ensued:

> THE COURT: But I don't think anybody is going to argue that he's waived; is that correct, Ms. Holt? [7] You're not going to argue he's waived are you?
>
> COUNSEL FOR HARRIS: I'm not going to preclude myself under the case law in the District of Columbia.

The defense contention that, aside from the suppression of the fruits of the seizure, the prosecution should have been dismissed because the seizure of the defendant's person was allegedly improper, is altogether without merit; Harris was not a fruit of his own stop. United States v. Crews, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980).

4. The judge originally stated that he did not credit Martin's testimony both because Martin's account of the sequence of events was illogical and because Martin had inaccurately described the direction in which Sergeant Neill was travelling. The judge later determined that Martin had been correct in describing Neill's direction. He nevertheless rejected Martin's testimony because, according to the judge, Martin's claim that Neill pulled out his weapon immediately after exiting the truck "flies in the face of reality."

5. The judge's finding was supported by substantial evidence, namely Sergeant Neill's testimony, see D.C.Code § 17–305(a) (1989), and we cannot second-guess his determination of credibility. In re S.G., 581 A.2d 771, 774–75 (D.C.1990). Under these circumstances, the motion to suppress evidence was properly denied, for the drugs had been abandoned and their recovery was not the fruit of an illegal seizure. United States v. Speed, 388 A.2d 892, 893 (D.C.1978).

6. The prosecutor had first raised the question of Martin's rights under the Fifth Amendment during Martin's testimony at the suppression hearing. When defense counsel stated that she would limit her questioning to "whether the officer had a gun when he got out of the car," the examination proceeded without objection in spite of the fact that Martin had not been formally advised of his rights.

7. Ms. Veronice Holt was Harris' counsel in the trial court and continues to represent him on appeal.

THE COURT: Well, ... I am going to rule that—right now, that because he testified this morning in the limited context in which he testified, does not in any fashion mean that he waived his—well, he waived his fifth amendment right. It was completely without counsel of his own choosing, and advice of somebody else's attorney is not the kind of advice that the Constitution talks about.

After the trial began, Martin's counsel requested a proffer from the defense of what Martin's testimony would be. Harris' attorney proffered that Martin would testify that the officer got out of his vehicle with his gun drawn, and that the three men (Harris, Wright, and Martin), apparently not believing that Sergeant Neill was a police officer, asked bystanders to call the police. The prosecutor stated that he proposed to interrogate Martin on cross-examination about his role in the incident, and that he might inquire as to whether Martin had observed the transaction between Wright and Harris. In response to an inquiry from Martin's attorney, the prosecutor said that it was a "distinct possibility" that Martin would be prosecuted if he admitted presence but denied any knowledge of the transaction. The prosecutor subsequently added that "if [Martin] was involved as a lookout or [in] any fashion in this particular transaction that occurred, then he would have a bias, and the Government should have the right to question him regarding his actions there at the time of this particular incident."

Martin was called to the witness stand and indicated that, upon advice of counsel, he would decline to testify. There followed a lengthy discussion between court and counsel, in which the defense attorney's sole theme was that the scope of her inquiry would be narrow and that there was no "real danger" that Martin would be prosecuted. Martin's counsel then had the following exchange with the judge:

COUNSEL FOR MARTIN: Given the proffer made in the Gerstein proffer by the Officer on the scene, as well as what I have been given to under[stand] his testimony was, about the role of the third person in this incident, that he was acting as lookout looking up and down the street, any statement by Mr. Martin that he was present in the location of that third person opens him up to possible prosecution. And it's not a fanciful or whimsical possibility. There is a very real possibility. He would be admitting that he was the person acting as an aider and abettor if there was a drug transaction.

THE COURT: What if I went further and decided that I have to be able to allow the Government on grounds of bias to question him in regard to his relationship to the defendant at the time of the scene?

COUNSEL FOR MARTIN: Again, those questions could be answered, hypothetically, in a way that would be incriminatory ... if Mr. Martin were to say that he was an associate of either Mr. Harris or Mr. Wright and had any knowledge whatsoever of what was going on. I'm certainly not saying that's what he would say.

THE COURT: I understand.

COUNSEL FOR MARTIN: But the test is whether there is an answer that could incriminate him, and there is, definitely.

THE COURT: All right.

Following this exchange, the judge gave his ruling, which we reproduce in its entirety:

All right. I understand the limited nature that Ms. Holt wants to use Mr. Martin's testimony for, and I understand that it is in some measure to impeach the credibility of Officer Neill. I heard this testimony—*I heard Mr. Martin in the motions hearing,* and, so I have the benefit of knowing what he would say in regard to one of these issues, and [that] is when Officer Neill had his gun drawn. And I can understand Ms. Holt's argument on the relevance of that.

And it does appear that Miss Holt's need and desire to put Mr. Martin on the stand is very limited in nature. However, and, obviously, the defendant has a right which has to be maintained and enforced to put on witnesses who might help his

cause, and so I'm not finding that the use which Miss Holt would put Mr. Martin's testimony to is not a good one. I am indeed finding that it would help the defendant to be able to put on Mr. Martin's testimony. And it's a very difficult balancing process I have to go through here. And in going through that process, in spite of the fact that I find Miss Holt's desire for Mr. Martin's testimony to be extremely limited, I find on balance that the issues that I would have to let the Government get into might very well lead to inculpatory statements beyond this [witness'] mere presence at the scene.

However, I further agree with Mr. Martin's attorney that the defendant stated [defendant's statement?] under oath that he was the third person on the scene, does give, even on that issue, give the Government a little more than the Government had beforehand for the reason that the third person was let go. The third person in this scenario was let go. *I can't tell what the government's position would be if they had on the record a positive identification of the third person on the scene,* which is why I asked Mr. Willoughby [8] whether he was prepared to give any immunity at all, use or otherwise. That being so, even without getting into the bias issues that I believe I would have to let the Government get into, even without getting into those, I think his testimony could be, Mr. Martin's testimony would be inculpatory. And his risk is a real one that indeed he would be prosecuted. When I add the bias issues at a [minimum], I haven't really thought of the bias issues that the Government could get into even on this limited direct examination, [in] that event if I just add the bias questions, I increase that risk substantially, it seems to me. And again it's a risk because I can't know what this defendant is going to answer to those questions. And so I have to assess the risk. And the risk of incrimination is substantial.

And I further conclude that the risk of prosecution is a real one and not fanciful. And it's a real one, particularly in light of the fact this third individual was let go on the scene. And the prosecuting authority, that is the U.S. Attorney's office, hasn't really had an opportunity to make a determination in regard to that third issue.

\* \* \* \* \* \*

In any event, balancing it all—and I think I am going to have a difficulty with this rule, with these kinds of rulings every time they crop up, maybe someday somebody will tell me how to make this ruling easy. I don't think it's an easy ruling.... I will sustain the defendant's invocation of privilege and indicate that there is no point in calling him as a witness because he will raise his Fifth Amendment [rights] and I would sustain his use of the Fifth Amendment.

(Emphasis added.)

The italicized portions of the judge's oral decision indicate that he grounded his ruling in large part on the prospect that Martin might incriminate himself by acknowledging that he was the man with Wright and Harris. Martin had, however, already made this disclosure during the suppression hearing.

## C. The Trial.

At trial, Sergeant Neill essentially repeated his testimony at the suppression hearing. Three other officers testified for the prosecution and Harris' sister testified for the defense, all on matters extraneous to the subject at hand. The jury convicted Harris of both charges. This appeal followed.

## II

### LEGAL DISCUSSION

■ As the trial judge explicitly recognized, a criminal defendant's right to present witnesses in his own defense is a fundamental one. *Wilson v. United States,* 558 A.2d 1135, 1140 (D.C.1989). Neverthe-

---

8. Mr. Willoughby was the prosecutor.

less, "in the crunch, when all else fails, the Fifth Amendment privilege of the witness prevails over the defendant's right to compel him to testify." *Id.* "Because both rights are so precious ... and because a forced election is so painful, it is the responsibility of the trial judge to take all reasonable steps to avoid a direct collision." *Id.*

 "Although a criminal defendant has the absolute right not to testify, a witness may invoke the privilege only as to those specific questions to which the answers would incriminate him." *Id.; see Vaughn v. United States,* 364 A.2d 1187, 1189 (D.C.1976). The privilege of a witness is narrower than that of a defendant, and extends only to specific questions; it does not encompass a refusal to take the stand at all. *Collins v. United States,* 596 A.2d 489, 491 (D.C.1991). Accordingly, when a Fifth Amendment claim is asserted by someone other than the defendant, the court must ordinarily permit examination of the witness (out of the presence of the jury in a jury trial) and rule on the claim of privilege one question at a time. *Wilson, supra,* 558 A.2d at 1142; *Davis v. United States,* 482 A.2d 783, 785 (D.C.1984).

The trial judge recognized his obligation to attempt to reconcile the competing interests, *Wilson, supra,* 558 A.2d at 1140, and to determine whether there was a real and substantial risk of prosecution. *Collins, supra,* 596 A.2d at 491. As the government now concedes, however, the judge misapplied the controlling principles.[9] By the time Martin invoked his privilege against self-incrimination during trial, he had already testified at the suppression hearing that he was the man who was with Wright and Harris, and thus the same individual who, according to Sergeant Neill, had apparently acted as a lookout for an unlawful drug transaction. He had thus potentially incriminated himself to a substantial degree well before he first asserted a claim under the Fifth Amendment. At least so far as his presence on the scene was concerned, there was no real danger of legal detriment arising out of the second disclosure. *Alston v. United States,* 383 A.2d 307, 313 (D.C.1978); *Ellis v. United States,* 135 U.S.App.D.C. 35, 45, 416 F.2d 791, 801 (1969). As Judge Leventhal stated for a majority of the court in *Ellis, supra,*

> [o]nce a witness has voluntarily spoken out, we do not see how his protected interest is jeopardized by testifying in a subsequent proceeding, provided he is not required to disclose matters of substance which are unknown to the Government.

*Id.* at 45, 416 F.2d at 801.

 Although Martin was not advised by the judge of his Fifth Amendment privilege at the time that he testified at the suppression hearing, this did not render his testimony involuntary or inadmissible at any hypothetical subsequent prosecution of him. The Fifth Amendment

> speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment.

*United States v. Monia,* 317 U.S. 424, 427, 63 S.Ct. 409, 410–11, 87 L.Ed. 376 (1943). If the testimony at the suppression hearing was voluntary, it is admissible; "an individual may lose the benefit of the privilege without making a knowing and intelligent waiver." *Garner v. United States,* 424 U.S. 648, 653–54 & n. 9, 96 S.Ct. 1178, 1182

---

**9.** When the case was initially briefed and argued, neither party addressed the question whether Martin's Fifth Amendment rights at the trial had been affected by his disclosures at the pretrial motions hearing. In a supplemental brief filed after argument, the government effectively confessed error, at least in part:

> Admittedly, Martin lost his privilege against self-incrimination regarding two limited issues by testifying at the suppression hearing

without invoking his privilege. Nevertheless, Martin retained his privilege at trial concerning the critical substantive matters about his role in the offense for which appellant was on trial and about which he had been asked during the cross-examination, but which had not been disclosed during the suppression hearing. Therefore, Martin retained his privilege with respect to self-incrimination.

& n. 9, 47 L.Ed.2d 370 (1976); *see also Minnesota v. Murphy,* 465 U.S. 420, 426–28, 104 S.Ct. 1136, 1141–43, 79 L.Ed.2d 409 (1984); 1 JOHN W. STRONG, MCCORMICK ON EVIDENCE, § 138, at 515–16 (4th ed. 1992).[10] There is nothing in the present record to suggest that Martin's testimony at the pretrial motion hearing was not voluntary.

Martin could, of course, have incriminated himself *further* if he were compelled to take the stand at trial and to respond to questions from the prosecutor regarding his knowledge of, or role in, the drug transaction involving Harris and Wright. Since he was not formally advised of his rights when he originally testified, he arguably cannot be viewed as having waived his privilege as to incriminating questions not previously asked. This is the import of the proviso in the passage from *Ellis* quoted at page 1282, *supra.* The focus of the inqui-ry should therefore have been on whether Martin would have been exposed to a substantial *incremental* risk of incrimination if he had been required to testify as a defense witness at the trial. The parties never addressed this question, and the trial judge never resolved it. In this posture, we are likewise in no position to decide it; a "dry run" of Martin's testimony outside the presence of the jury would have been necessary to determine if the competing interests could reasonably have been accommodated, and the judge should have conducted one. *See Collins, supra,* 596 A.2d at 491.[11]

Under the circumstances of the present case, however, we do not have to decide what balance the judge should have reached.[12] The precise moment when Neill drew his weapon has no direct bearing on the question whether Harris possessed co-

---

**10.** After noting that it is within the trial judge's discretion to advise a witness of his or her privilege against self-incrimination and to appoint an attorney to consult with the witness, Professor McCormick provides the following prudent warning:

> The matter becomes more delicate in a criminal trial when the judge becomes concerned that a defense witness's self-incrimination rights may be placed in unfair jeopardy. The witness's self-incrimination interests, of course, are no less in such situations. But the defense has a particularly important interest that is also affected—the defendant's Sixth Amendment right to present all potentially exculpatory evidence. As the Supreme Court recognized in *Webb v. Texas,* [409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330] (1972), trial judges' efforts to protect defense witnesses' interests may impermissibly intrude upon defendants' right to produce evidence.
>
> Perhaps the most that can be generally said with confidence in such situations is that trial judges have a special duty to seek an accommodation between witnesses' self-incrimination interests and defendants' interests in full production of relevant evidence. The judge is not barred from alerting the witness to her self-incrimination right, but the judge's authority to caution the witness should be exercised sparingly and with great caution.

MCCORMICK, *supra* § 138, at 515–16. (Footnotes and internal quotation marks omitted). Moreover, "[p]ermitting the prosecutor to participate in admonishing the witness probably poses substantial risks of overreaching." *Id.* at 516 n. 10 (citation omitted). *But see In re J.W.Y.,* 363 A.2d 674, 683 (D.C.1976) (rejecting claim that prosecutor had induced invocation of Fifth Amendment privilege by "coercive pressure," where "[n]othing in the record indicate[d] that the government's role was anything greater than merely broaching the subject of the witnesses' potential criminal liability").

**11.** We note that at the suppression hearing, at which the subject of Martin's testimony (*i.e.,* whether Sergeant Neill drew his weapon before or after Harris dropped the drugs) was of far greater significance than at the trial on the merits, the prosecutor did not find it necessary to conduct any cross-examination as to bias or to interrogate Martin on his role in the incident. The prosecutor could reasonably argue, however, that for tactical reasons, it was more important to impeach Martin before the jury than before the judge.

**12.** The prosecutor, as we have noted, agreed with the judge that Martin's testimony at the motions hearing should not be deemed a waiver or a basis for prosecuting him. As the government suggests in its supplemental brief, this could be viewed as an informal (though unauthorized) promise of immunity after the fact, at least as to those questions which Martin had already answered. We question, however, whether the government could legitimately tell Martin, in effect, that "we will not prosecute you on the basis of what you have already said, but we may prosecute you if you become a trial defense witness for Harris and simply repeat your previous testimony." Such a message would condition Martin's immunity on his not testifying at the trial. The government has not argued here that this is the posture of the case, and we are confident that it would not contrive in this manner to deny a defendant the opportunity to present a witness.

caine with the intent to distribute it. Harris' only proffered basis for introducing testimony about the subject is that such evidence would have helped the jury to assess the sergeant's credibility with respect to the incident as a whole.

■ Generally, a party may not present extrinsic evidence to impeach a witness on collateral issues. *Patterson v. United States*, 580 A.2d 1319, 1322 (D.C.1990); *McClain v. United States*, 460 A.2d 562, 569 (D.C.1983). Testimony is collateral if it would not have been admissible for any purpose other than the contradiction. *See Washington v. United States*, 499 A.2d 95, 101 (D.C.1985). "To prove [a witness] wrong in some trivial detail of time, place and circumstance is [likewise] collateral." EDWARD W. CLEARY, MCCORMICK ON EVIDENCE, § 47, at 111 (3d ed. 1984). Martin's proffered testimony would have contradicted Sergeant Neill on a point unrelated to the decisive issue in this case, which was whether Harris had possessed and discarded the drugs.

Moreover, once his invocation of his privilege against self-incrimination had been sustained by the court, Martin became unavailable to testify. *Alston v. United States*, 383 A.2d 307, 315 (D.C.1978). Defense counsel could therefore have moved into evidence Martin's sworn testimony at the suppression hearing, at which the prosecution had ample motive and opportunity to (and did) cross-examine him on the same factual issues. *Id.; see also* FED.R.EVID. 804(b)(1); *United States v. Salerno*, —— U.S. ——, ——, 112 S.Ct. 2503, 2507, 120 L.Ed.2d 255 (1992). The admission of Martin's previous testimony would not have further incriminated him, and we know of no basis on which that testimony, if relevant, could have been excluded.

To be sure, live testimony provided by a flesh and blood witness relating what he or she personally observed is often preferable to the cold anonymity of the printed page, and even to the thespian enlivenment of a transcript by someone selected by counsel to read the lines of an absent witness. Nevertheless, it is difficult to see how Harris could have been prejudiced here by the difference in quality between live and recorded testimony, for Martin's proposed evidence related to a point which was tangential to the principal controversy.[13]

### III

### CONCLUSION

For the foregoing reasons, the judgment appealed from is hereby

*Affirmed.*[14]

---

13. While his counsel did not waive the point, see page 1279, *supra*, Harris did not affirmatively argue to the trial court (or in his initial brief on appeal) that Martin's prior testimony undercut his Fifth Amendment claim at trial. In light of our disposition of the appeal, we need not decide whether this omission limits our review to an inquiry as to "plain error," *see Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc).

14. We discern no merit in Harris' remaining contentions. The trial judge properly declined to exclude from evidence the $31.00 found on Harris. *Bigelow v. United States*, 498 A.2d 210, 213–14 (D.C.1985). If Harris had not been in possession of any money on his person, he could properly have argued that this made it less likely that he had been selling drugs; the converse is equally true, and there was no undue prejudice. It was also within the judge's discretion to admit the drugs into evidence over a defense objection that the chain of custody had not been established. *Key v. United States*, 587 A.2d 1072, 1074 (D.C.1991). The judge properly declined to grant a defense request for a "missing witness" instruction. *German v. United States*, 525 A.2d 596, 611 (D.C.), *cert. denied*, 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987). Finally, the judge did not abuse his discretion when he declined to order a mistrial during the government's closing argument, after the prosecutor, with reasonable accuracy, attributed to the defense an allegation that Sergeant Neill had fabricated his testimony. *Lee v. United States*, 562 A.2d 1202, 1204 (D.C.1989).